IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MEDLINE INDUSTRIES, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 09 C 581 |
| | ) | |
| CYMBION, LLC, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OPINION AND ORDER

JAMES F. HOLDERMAN, Chief Judge:

Plaintiff Medline Industries, Inc. ("Medline") is an Illinois corporation headquartered in Mundelein, Illinois (Dkt. No. 70 ("Cymbion's Local R. 56.1(b)(3) Resp.") ¶ 1), and defendant Cymbion, LLC ("Cymbion") is a Kentucky limited liability company headquartered in Louisville, Kentucky (*id.* ¶ 2). Medline originally filed its complaint in the Circuit Court of Cook County, asserting claims against Cymbion for breach of contract (Count I) and for a declaratory judgment that Medline terminated the parties' supply agreement with cause (Count II). (Dkt. No. 1, Ex. 1 ("Compl.") ¶¶ 19-26.) Cymbion timely filed its Notice of Removal pursuant to 28 U.S.C. §§ 1441 and 1446 and then filed its answer and a counterclaim for breach of contract. Because none of Cymbion's members is a citizen of Illinois (*see* Dkt. No. 1, Notice of Removal ¶ 4), and the amount in controversy exceeds $75,000 (*id.* ¶ 6), this court has diversity jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). Currently before the court is Medline's "Motion for Summary Judgment on Count II of Its Complaint and Defendant's Counterclaim" (Dkt. No. 61 ("Medline's Mot.")). For the reasons explained below,

Medline's Motion is denied.[1]

BACKGROUND

For purposes of Medline's Motion for Summary Judgment, the relevant facts of this case are described below in the light most favorable to Cymbion. *See Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008).

## I.     The Parties

Medline is a nation-wide distributor of medical products. ("Cymbion's Local R. 56.1(b)(3) Resp.") ¶ 1.) Cymbion is a medical products manufacturer managed by two brothers, Dipak Narula and Vinod Narula (referred to hereafter individually as "Dipak" and "Vinod" and collectively as "the Narulas"). The Narulas together own a majority of Cymbion. (*Id.* ¶¶ 9, 10.)

## II.     The Supply Agreements

In 2005, Medline entered into a supply agreement with Cymbion, dated May 11, 2005 ("First Supply Agreement"), for the purchase of medical scrub brushes. (*Id.* ¶ 18.) On December 16, 2005, Medline and Cymbion entered into a second supply agreement ("Second Supply Agreement" or "Agreement") that superceded the First Supply Agreement and altered both the price terms and the scrub brushes' specifications. (*Id.* ¶ 23.) Under the terms of the Second Supply Agreement, Cymbion agreed to manufacture both "dry" and "wet" scrub brushes (collectively "Products") for Medline. (*Id.* ¶¶ 30-31.)

---

[1] The parties filed several documents related to Medline's Motion for Summary Judgment under seal without offering any indication to the court what information they consider confidential. To the best of its ability, the court has only included information in this opinion which it deems non-confidential.

"Dry" scrub brushes do not contain any chemicals (such as liquid antiseptics) and are intended to be used in conjunction with antimicrobial soap and water by surgeons to clean the skin on their arms and hands before surgery through an abrasive, scrubbing action that removes germs and bacteria. (*Id.* ¶ 30.) "Wet" scrub brushes are manufactured in the same way as the *dry* scrub brushes except the *wet* scrub brushes are impregnated with one of three liquid antiseptics: (a) Povidone-Iodine ("PVP"); (b) Chlorhexidine gluconate ("CHG"); or (c) parachlorometaxylenol ("PCMX"). (*Id.* ¶ 31.)

Exhibit B of the Second Supply Agreement outlines the "Product Specifications" for the scrub brushes. Based on those specifications, each scrub brush was to be enclosed in a "[t]hermoformed pouch and vacuum sealed," using Alcan M-6221 Medical Device Forming Film and Alcan M-6200[2] Medical Device Lidding Stock for the thermoform packaging materials. (Cymbion's Ex. 1, Second Supply Agreement 9.) The packaging pouch was to be "heat sealed" with a "peel strength [of] 2 to 4 pounds" (*id.* at 10),[3] which were "estimated approximate values" and the "[a]ctual values [would] not be known until actual product [was] made" (*id.*). Additionally, the specifications do not state whether the identified peel strengths refer only to the leading edge of the packaging pouch or to all the edges. (*See id.*) Under the terms of the Second Supply Agreement, Cymbion also was "solely responsible . . . for ensuring that the [scrub brushes] conform[] to any regulatory specifications set forth for the [scrub brushes]." (Cymbion's Local R. 56.1(b)(3) Resp. ¶ 26; Second Supply Agreement § 1(c).)

The Second Supply Agreement further required that Medline purchase "committed

---

[2]  The Second Supply Agreement incorrectly identifies the M-6200 film as "M-62220." (*See* Medline Ex. 38 at 2.)

[3]  "Peel strength" refers the force required to pull two items apart. (Cymbion's Ex. 10, Dipak Dep. 204:13-18.)

annual minimum purchase volumes" of the scrub brushes (Second Supply Agreement 7), and this obligation would be triggered when Cymbion delivered "acceptable quality product" to Medline (*id.* § 6). The Second Supply Agreement does not state what percentage of the "committed annual minimum purchase volumes" was to consist of *dry* as opposed to *wet* scrub brushes. (*See id.* at 7.)

Additionally, according to the Agreement, "[i]f the Buyer [Medline] reasonably determines that the Products do not conform to the Product Specifications or otherwise are not in good and merchantable condition at the time of delivery to the Buyer, the Buyer shall have the right to return the Products to the Seller [Cymbion] at the Seller's cost for replacement by the Seller." (*Id.* § 2(b).)

Under Exhibit C of the Second Supply Agreement, if Medline terminated the Second Supply Agreement "without cause," within thirty-six months of its execution and before 24 million Products had been purchased, Medline agreed to "(a) purchase a maximum of 3 months inventory based on the rolling forecast provided [to Cymbion]; (b) make a unit shortfall payment, corresponding to the year of the shortfall as specified . . . ; and (c) purchase the machinery, tooling, and other prototypes associated with the Product production . . . as specified . . . ." (*Id.* at 12.)

III.    Manufacturing the Scrub Brushes

After the execution of the Second Supply Agreement, Cymbion worked on manufacturing scrub brushes that met Medline's specifications, including certain specifications based on Medline's interpretations of the relevant Food & Drug Administration ("FDA") regulations. Joe Dunn, who was the Director of Quality Assurances in the Dynacor Division of Medline (Medline Ex. 16, Dunn Aff. ¶ 3), advised Cymbion that in addition to complying with

the FDA's *device* regulations, Medline believed that the *wet* scrub brushes also had to comply with the FDA's *drug/pharmaceutical* regulations (*id.* ¶ 10; Cymbion's Local R. 56.1(b)(3) Resp. ¶ 53). Such compliance included placing an expiration date on the product packaging which was established by an acceptable scientific test, known as a "stability study." (Cymbion's Local R. 56.1(b)(3) Resp. ¶ 53.) In early 2006, Medline informed Dipak, who appears to have been more personally involved in the Medline communications than Vinod, that Medline wanted samples of the *wet* scrub brushes to undergo stability testing. (Cymbion's Ex. 2, Dipak Aff. ¶ 30.) Although Cymbion apparently questioned whether the *wet* scrub brushes had to comply with the FDA drug/pharmaceutical regulations (*see* Dipak Dep. 93:10-15), Dipak ultimately sent Cymbion's samples to Q Laboratories, which performed six months of stability testing (Dipak Aff. ¶ 30). After the stability testing was completed, Dunn informed Dipak that he was dissatisfied with the results and requested that Cymbion find another laboratory to perform additional stability testing, which would take approximately three months. (*Id.* ¶ 31; *see also* Cymbion Ex. 29, MED0000217 (noting that second stability testing would be a "three month process.") In January 2007, Dipak sent protocols to Dunn from another testing laboratory, Custom Industrial Analysis ("CIA") Labs, which Dunn ultimately approved. (Dipak Aff. ¶ 32.) While the samples were undergoing a second round of stability testing, Medline terminated the Second Supply Agreement. (*Id.* ¶ 32.)

On April 6, 2006, Dipak sent Dunn Cymbion's proposed validation protocols for manufacturing the Products (Dkt. No. 78 ("Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts") ¶ 19), and in June 2006, Dale Greeson, a Medline validation engineer, became involved in the Cymbion project (Cymbion Ex. 6, Greeson Dep. 90:4-6). Greeson was responsible for verifying that Cymbion's validation protocols satisfied the relevant regulations

(*id.* at 89:17-21), and in September 2006, Greeson sent Cymbion the actual validation protocols Medline wanted Cymbion to employ.  (Cymbion Ex. 35, MED0001497; Dipak Dep. 147:19-148:5.)

Also in August 2006, Medline submitted a provisional purchase order for the Products to Dipak.  (Dipak Aff. ¶ 17; Medline's Ex. 31, CYM3191-92; Medline's Ex. 15, Palmer Aff. ¶ 14.) Dipak had requested this purchase order to enable Cymbion to estimate the amount of raw materials necessary for manufacturing the surgical scrub brushes under the Second Supply Agreement.  (*Id.*)[4]  The provisional purchase order listed a delivery date of September 18, 2006, but Cymbion never delivered the products.  (Medline's Ex. 31, CYM3191-92.)

By September 2006, Cymbion had submitted samples of the packaging pouches to Medline for testing and evaluation.  (Cymbion's Ex. 38, MED0006495.)  Based on the results of the testing, Dunn informed Dipak that it "[w]ould be great for all samples to have . . . same seal on all sides."  (*Id.*)  Medline does not dispute that it believed the peel strength specifications in the Second Supply Agreement apply to all four sides of the packaging.  (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 23.)  As discussed above, the Product Specifications outlined in Exhibit B of the Second Supply Agreement do not specify whether the identified peel strengths refer to all sides of the packaging pouch or just the leading edge. Nevertheless, with Medline's assistance, Cymbion began working to meet Medline's peel

---

[4]  To the extent that Medline objects to Dipak's statement in his affidavit that "Medline provided Cymbion with a provisional purchase order at [Dipak's] request" and that he "requested this purchase order so that Cymbion could estimate the amount of raw materials it would need to acquire to prepare itself to manufacture the surgical scrub brushes" (*see* Medline's Mot. Strike 26), that objection is overruled.  Based on the evidence currently presented to the court, the court finds that Dipak has sufficient personal knowledge to offer such testimony under Federal Rule of Evidence 602.

strength request.  Specifically, during September 2006 and December 2006, Medline flew its employees, including three of its engineers, Dale Greeson, David Dziekan, and Earl David Wilson (Medline's Chief Manufacturing Engineer), to Cymbion's manufacturing facility to assist Cymbion in achieving the peel strength that Medline requested for the packaging pouches and evaluate Cymbion's form, fill, and seal machine ("FFS Machine"), the machine used to heat-seal the packaging for the individual scrub brushes.   (*See* Cymbion's Local R. 56.1(b)(3) Resp. ¶¶ 41-43.)

While Medline and Cymbion continued to work on the peel strength issue, in October 2006, Dunn sent Cymbion a list of protocols and other documents which it required Cymbion to submit as Medline's "first attempt" to get Cymbion into "basic compliance," including revising and updating Cymbion's Quality Manual to comply with Medline's interpretations of the relevant FDA drug/pharmaceutical regulations.  (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 21; Cymbion Ex. 36, MED0000170-73.)  In response to this request from Medline, Cymbion revised its protocols, procedures, and forms, including its Quality Manual.  (Dipak Aff. ¶ 22.)

By December 29, 2006, using the September 2006 validation protocols Greeson provided to Cymbion, Cymbion and Medline completed the Installation Qualification ("IQ") stage of Medline's validation method but the validation ultimately did not progress to the next stage—the Operations Qualification ("OQ") stage—because Medline instructed Greeson to stop working on the Cymbion validation.  (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 20.)  Then, in January 2007, Medline and Cymbion, through their continued efforts to achieve Medline's requested peel strength, found a "range," which still needed to be finalized, for Cymbion's FFS machine to be run on that met Medline's sealing and opening criteria for the

packaging pouches.  (*Id.* ¶ 34; Cymbion's Ex. 46, MED0000243.)

Around this same time, Cymbion received a letter from Alcan, the manufacturer of the thermoforming film specified in the Second Supply Agreement for the Products' packaging. (Cymbion's Local R. 56.1(b)(3) Resp. ¶ 46; Second Supply Agreement 9.)  In that letter, Alcan informed Cymbion that the films it had purchased "should not be used for validation or production as they are beyond their shelf life."  (Medline's Ex. 38; Medline Ex. 13, Shelton Dep. 84:1-87:22.)  Medline requested that Cymbion use new material from Alcan, and Cymbion took action to order this new material.  (Dipak Aff. ¶ 34.)[5]  However, Cymbion did not receive the material before Medline terminated the Second Supply Agreement.  (*Id.*)

IV.    Cymbion's Ability to Manufacture Products Complying with the Product Specifications

During this product development period, Cymbion was submitting various sample scrub brushes to Medline which, according to Cymbion, would have complied with the Agreement's Product Specifications.  (Dipak Dep. 103:8-104:20.)[6]  Cymbion also provided Medline with

---

[5]  In his affidavit, Dipak attests that "Cymbion took action to order new material from Alcan." (Dipak Aff. ¶ 34.)  Medline objects to this statement, arguing that it is "conclusory," "lacks foundation and appears to be based on hearsay."  (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 36.)  The court disagrees.  First, based on the evidence of Dipak's personal knowledge currently before the court, including Dipak's deposition testimony, his affidavit, and the various documents cited to the court, the court finds that Dipak would possess personal knowledge regarding Cymbion's purchasing of materials for the Products, and his affidavit confirms that he has "personal knowledge of the facts set forth herein."  (Dipak Aff. ¶ 1.)  Moreover, the court disagrees that this statement is "conclusory"; rather it is a statement of fact based on Dipak's personal knowledge.  Finally, Medline has not explained how this testimony "appears to be based on hearsay."  Consequently, the court finds that Dipak could offer such testimony at trial pursuant to Federal Rule of Evidence 602, and Medline's objection accordingly is overruled.

[6]  Specifically, Dipak testified that the sample scrub brushes Cymbion provided Medline complied with the terms of the Second Supply Agreement's specifications, with the exception of two changes made to those specifications at Medline's request regarding the amount of solution to put on the sponge and the povidone iodine.  (Dipak Dep. 103:8-25.)

samples of the packaging pouches that met the 2 to 4 pound peel strength requirement on the leading edge of the pouch.  (*Id.* at 104:21-23.)

V.      Medline Contemplates Terminating the Second Supply Agreement

In August 2006, after a visit to Cymbion's manufacturing facility, Dunn prepared a report of the state of the Products development for Ken Chua, President of Medline's Dynacor Division (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 29; Cymbion's Ex. 41, MED0000351-355.)  In that report, Dunn recommended that Medline either take over supervision of the manufacturing of the Products or manufacture the scrub brushes itself.  (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 29.)  In response to Dunn's report, Chua told Dunn that he is "leaning toward the fact that we might want to [manufacture the scrub brushes at Medline] but I need to make the transition at the right time." (*Id.*)  According to Chua, "to pull now will cause lots of other issues" because Cymbion "has invested time and money in the project."  (*Id.*)  In October 2006, Chua also talked with Brian Palmer, a product manager within the Dynacor Division of Medline, about having Medline manufacture the scrub brushes in-house.  (*Id.*; Medline Ex. 15, Palmer Aff. ¶ 2)

On November 13, 2006, Palmer requested that Dunn, Greeson, and Dziekan provide him with a summary of their hours spent working on the Cymbion Products.  (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 33.)  Palmer explained to them that he was going tell Cymbion that Medline needed verification of those hours for R&D purposes.  (*Id.*) In fact, Palmer wanted written documentation from Cymbion that Cymbion agreed that Medline had been contributing time to the products "as a backup later if [Medline] break[s] the contract." (*Id.*)  Then, on November 21, 2006, Palmer asked Dipak to confirm whether he agreed with the identified hours, telling Dipak that Medline needed the verification for tax purposes in reporting

R&D time at a lower tax rate. Palmer later told Chua that the "real reason" he requested this information from Dipak was "in case we need to show legally that we were there and helping in trying to get it up and running, vs. being a negligent customer and negligent on the contract." (*Id.*)

## VI.     Termination of the Agreement and Post-Termination Activity

In May 2007, Medline informed Cymbion that it was terminating the Second Supply Agreement. (*Id.* ¶ 38.) After terminating the Second Supply Agreement, Medline began working on manufacturing its own scrub brushes in-house and internally discussed Cymbion's procedures, protocol, suppliers, and data from testing Cymbion's Products in connection with Medline's own efforts to manufacture scrub brushes. (*Id.* ¶ 39.) Medline currently sells its own *dry* scrub brushes but has been unable to sell its *wet* scrub brushes because they are still under development. (*Id.*)

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). In making this assessment, "[a]ll facts and reasonable inferences are to be construed in favor of the nonmoving party." *Fischer v. Avanade, Inc.*, 519 F.3d 393, 401 (7th Cir. 2008) (quoting *South v. Ill. EPA*, 495 F.3d 747, 751 (7th Cir. 2007)).

## ANALYSIS

## I.     Motions to Strike

After the parties completed their briefing on Medline's Motion for Summary Judgment, Medline filed a "Motion for Leave to File, *Instanter*, an Oversize Motion to Strike Various Rule

56.1 Materials Submitted By Defendant" (Dkt. No. 81), which this court granted on September 16, 2006 (Dkt. No. 86). Medline subsequently filed its Motion to Strike (Dkt. No. 85 ("Medline's Mot. Strike")). Cymbion responded to Medline's Motion to Strike (Dkt. No. 87), and filed its own "Cross Motion to Strike Various Rule 56.1 Materials Submitted by Plaintiff" (Dkt. No. 88 ("Cymbion's Mot. Strike")).

In ruling on Medline's Motion, the court has only considered those facts presented by either Medline or Cymbion which are supported by the cited evidence, viewing the evidence in the light most favorable to Cymbion. To the extent the court relies on any evidence to which the parties have objected in their respective motions to strike, the court addresses the objections to that evidence in this opinion. The remaining objections to evidence that the court finds is not material to Medline's Motion for Summary Judgment are denied as moot.

Finally, Medline's has asked that the court not consider Dipak's "Amended Affidavit" or Cymbion's "Amended Statement of Additional Material Facts Establishing Genuine Issues for Trial," which Cymbion attached as exhibits to its Response to Medline's Motion to Strike. (*See* Dkt. No. 87, Exs. A, B.) The court finds that reliance on these additional materials is not necessary for the court to rule on Medline's Motion for Summary Judgment and accordingly has not considered them.

II.     Motion for Summary Judgment

Medline has moved for summary judgment on its claim for a declaratory judgment that it terminated the Second Supply Agreement with cause (Count II) and on Cymbion's counterclaim that Medline breached the Agreement. For the reasons explained below, the court finds that Cymbion has demonstrated a genuine issue of material fact on these claims, precluding entry of summary judgment in favor of Medline.

11

A.    Medline's Declaratory Judgment Claim

As discussed above, if Medline terminated the Second Supply Agreement "without cause within thirty-six months of the date of execution," it agreed to "(a) purchase a maximum of 3 months inventory based on the rolling forecast provided [to Cymbion]; (b) make a unit shortfall payment, corresponding to the year of the shortfall as specified . . . ; and (c) purchase the machinery, tooling, and other prototypes associated with the Product production . . . as specified . . . ." (Second Supply Agreement 12.)  Medline does not dispute that it terminated the Second Supply Agreement within 36 months of the date of execution without purchasing any scrub brushes. (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 7.)  Rather, Medline argues that its termination of the Second Supply Agreement was with cause, and thus not subject to any contractual penalties, because Cymbion had not complied with the FDA's drug regulations requiring an expiration date on drug packages "determined by acceptable testing methods."  (Dkt. No. 62 ("Medline's Mem.") at 12, 15.)  Cymbion, on the other hand, contends that whether Medline terminated the Agreement with cause is a question of fact for the jury.  The court agrees with Cymbion on this point.

The Second Supply Agreement does not provide a timeline for manufacturing a product that complies with the relevant FDA regulations nor does it identify the particular circumstances under which Medline can terminate the Agreement with, as opposed to without, cause. Moreover, Cymbion has presented evidence from which a reasonable jury could infer that Cymbion was attempting to comply with the terms of the Second Supply Agreement but had been delayed in its ability to perform based on its efforts to meet Medline's demands, including Medline's request that Cymbion send sample products for a second round of stability testing to establish the expiration dating of the *wet* scrub brushes.  Whether Medline's subsequent decision

12

to terminate the agreement based on Cymbion's failure to produce a product that complied with the FDA's drug/pharmaceutical regulations regarding expiration dating–while Cymbion was in the process of establishing that expiration dating at Medline's request–constitutes a termination "for cause" is a genuine issue of material fact inappropriate for resolution on summary judgment.

*Alra Laboratories, Inc. v. American Cyanamid Co.*, 92 C 2252, 1999 WL 160710 (N.D. Ill. Mar. 11, 1999), cited by Medline, does not support an opposite result. In *Alra*, the parties entered into a supply agreement for the purchase of certain pharmaceutical drugs. The agreement between the parties "excused [the buyer] from 'taking delivery' if [the buyer's] use of the product was 'prevented, restricted or interfered with by reason of any event or cause whatsoever beyond [its] control.'" *Id.* at *1 (third alteration in original). After the parties executed the purchase order, the FDA began investigating certain manufacturing violations by the manufacturer which threatened the FDA approval of the pharmaceutical drugs at issue. *Id.* at *1. The FDA eventually entered into a voluntary agreement with the manufacturer prohibiting the sale of those drugs and also informed the buyer that it considered the drugs the buyer had received to be "adulterated." *Id.* at *1-4. Before the FDA investigation was complete in *Alra*, the buyer had rejected the delivered drugs and cancelled a purchase order for an additional shipment of those drugs. *Id.* at *2-3. The pharmaceutical manufacturer sued the buyer for breach of contract. *Id.* at *3. The district court granted the buyer's motion for summary judgment, finding that the buyer's rejection of the products and cancellation of the purchase order did not amount to a breach of contract because, based on the FDA investigation, the buyer was entitled to reject the drugs rather than market them.

Specifically, in finding that the rejection of the delivered products did not amount to a breach of the parties' agreement, the court in *Alra* emphasized that in marketing the products, the

13

buyer "would have incurred a number of costs" including damage to its reputation, potential legal proceedings for passing on unmarketable goods to its customers, possible FDA action, foreclosure of otherwise available contractual remedies, and administrative costs due to "greater FDA involvement in its affairs." *Id.* at *5. Additionally, because any future drugs the manufacturer would have produced and distributed were subject to the then-pending FDA seizure order, the court found that the buyer properly cancelled the purchase order.

In this case, in contrast, Medline has not presented any evidence that the FDA either was investigating Cymbion's products or had prohibited the sale of those products. Nor has Medline demonstrated that without terminating the Agreement, it would have incurred the type of pecuniary or reputational costs that confronted the buyer in *Alra*. Moreover, in *Alra*, the buyer was entitled to terminate the agreement if its "use of the product was 'prevented, restricted or interfered with by reason of any event or cause whatsoever beyond [its] control.'" *Id.* at *1. Here, on the other hand, the Second Supply Agreement simply recognizes without further explication that a "without cause" termination by Medline would result in certain penalties. Without a more definite statement in the Agreement explaining when termination is "with cause," the court finds that under the circumstances of this case, whether Cymbion's failure to have an established an expiration dating for the *wet* scrub brushes by May 2007 was cause to terminate that Agreement is a question of fact for the jury. Consequently, Medline's Motion for Summary Judgment on its claim for declaratory judgment (Count II) is denied.

B.      Cymbion's Breach of Contract Counterclaim

Medline has also moved for summary judgment on Cymbion's breach of contract counterclaim. Under the Second Supply Agreement, Illinois law applies to this action. (Second Supply Agreement § 10.) In Illinois, "a breach-of-contract claim requires: (1) an offer and

acceptance; (2) consideration; (3) definite and certain terms; (4) performance by the plaintiff of all required conditions; (5) breach; and (6) damages caused by the breach." *Cogswell v. CitiFinancial Mortgage Co.*, No. 08-2153, 2010 WL 3927694, at *6 (7th Cir. Oct. 5, 2010). In this case, Cymbion contends that Medline breached the Second Supply Agreement by either (1) breaching the Agreement's implied duty of good faith and fair dealing or (2) failing to purchase any *dry* scrub brushes.

1.      Breach of Implied Duty of Good Faith and Fair Dealing[7]

In Illinois, "the duty of good faith and fair dealing is implied in every contract," *Gore v. Ind. Ins. Co.*, 876 N.E.2d 156, 161 (Ill. App. Ct. 2007), and it "ensure[s] that parties do not take advantage of each other in a way that could not have been contemplated at the time the contract was drafted or do anything that will destroy the other party's right to receive the benefit of the contract," *id.* The duty is implicated "when one party is given broad discretion in performing its obligations under the contract." *Id.* at 161-62. It acts as "a limitation on the exercise of that discretion, requiring the party vested with discretion to exercise it reasonably and with proper motive, not arbitrarily, capriciously, or in a manner inconsistent with the parties' reasonable expectations." *Id.* at 162. The duty is not, however, "an independent source of duties for contracting parties." *Id.*

In this case, the court finds that certain provisions in the Second Supply Agreement did vest Medline with discretion. Specifically, the Second Supply Agreement provides that "[i]f the Buyer [Medline] *reasonably determines* that the Products do not conform to the Product

---

[7]  In its Reply, Medline appears to incorrectly characterize Cymbion's allegations regarding Medline's breach of the implied duty of good faith and fair dealing as an "affirmative defense" when those allegations are actually a basis for Cymbion's breach of contract counterclaim.

Specifications or otherwise are not in good and merchantable condition at the time of delivery to the Buyer, the Buyer shall have the right to return the Products to the Seller [Cymbion] at the Seller's cost for replacement by the Seller." (Second Supply Agreement § 2(b) (emphasis added).) The Agreement additionally recognizes that "[t]he 36-month committed volume period of the agreement will commence . . . after Seller has manufactured and delivered *acceptable quality products* to Medline warehouses." (Second Supply Agreement § 6 (emphasis added).)

Medline offers two primary reasons for why neither of these provisions is applicable. First, regarding § 6's reference to "acceptable products," Medline argues that "Cymbion fails to explain how this provision vests Medline with discretion." (Dkt. No. 77 ("Medline's Reply") 11.) Again, as stated above, the court finds that the Second Supply Agreement's reference to "acceptable products" does vest Medline with the discretion to determine whether the Products Cymbion manufactured pursuant to the Second Supply Agreement are "acceptable," a determination which would commence the "36-month committed volume period." (Second Supply Agreement § 6.) Consequently, under the Agreement, Medline was obligated to exercise that discretion in good faith and in a manner consistent with the parties' reasonable expectations. *Gore*, 876 N.E.2d at 162.

Second, turning to § 2(b), Medline does not dispute that this provision vests it with the discretion to reject products that do not conform to the Product Specifications or otherwise are not in good and merchantable condition. Instead, Medline contends that although this provision vests it with discretion, it never exercised that discretion because it did not terminate the Second Supply Agreement based on the failure of Cymbion's products to satisfy the *Product Specifications*, which are listed in Exhibit B to the Second Supply Agreement. Rather, according to Medline, it terminated the Agreement due to Cymbion's failure to comply with the applicable

FDA drug/pharaceutical regulations regarding expiration dating, and § 2(b), therefore, does not apply.

The court finds that this argument is flawed for at least two reasons. First, Medline has not explained why its rejection of Cymbion's *wet* scrub brushes based on their failure to comply with the relevant FDA regulations does not constitute a determination that the brushes were not of "good and merchantable condition" under § 2(b). If the brushes did not comply with the FDA regulations, they presumably would not be "merchantable." Second, regardless of whether Medline's ultimate basis for *terminating* the Agreement falls within the discretion afforded it under § 2(b), Medline nevertheless could have exercised its discretion under § 2(b) by first refusing to accept products which it found did "not conform to the Product Specifications" or were "otherwise . . . not in good and merchantable condition." Consequently, the court finds that whether Medline's various requests regarding the Products' compliance with certain FDA regulations and packaging requirements amount to an exercise of its discretion under either § 2(b) or § 6 is a question of fact for the jury.[8]

Furthermore, assuming Medline exercised its discretion under either § 6 or § 2(b), Cymbion has established a genuine issue of material fact as to whether Medline's actions were arbitrary, unreasonable or inconsistent with the parties' reasonable expectations. First, Medline does not dispute that as early as nine months prior to its termination of the Second Supply Agreement, Medline contemplated producing the scrub brushes in-house. Ultimately, after terminating the Agreement, Medline began producing its own *dry* scrub brushes, and its *wet* scrub brushes remain under development. Medline similarly does not dispute that in November

---

[8]  Medline has not argued that it never exercised its discretion under these provisions because it did not reject any final, as opposed to sample, Products. The court accordingly does not address this issue at this time.

2006, it misrepresented to Dipak the reason why Medline wanted him to verify the amount of hours Medline had spent working with Cymbion on the development of the scrub brushes; despite telling Dipak that the verification was for tax purposes, Dunn admitted that it actually was going to be used "as a backup later if Medline break[s] the contract."  (Medline's Resp. Cymbion's Local R. 56.1(b)(3)(C) Stmt. Add'l Facts ¶ 33.)

These undisputed facts, coupled with Medline's various requests regarding the product specifications and compliance with FDA drug/pharmaceutical regulations discussed below, when viewed in the light most favorable to Cymbion, are sufficient evidence from which a jury could reasonably infer that Medline's actions amounted to a breach of the implied duty of good faith and fair dealing.

For example, the Second Supply Agreement does not expressly state whether the specified peel strength for the packaging pouches refers to all four sides of the pouch or only the leading edge.  Medline, however, requested that the product packaging peel strength apply to all four sides of the packaging pouches.  Because this product specification in the Agreement "is capable of being understood in more sense than one," the court finds that it is ambiguous; its interpretation, therefore, is a question of fact for the jury.  *Farm Credit Bank v. Whitlock*, 581 N.E.2d 664, 667 (Ill. 1991).  Should the jury decide that the peel strength specifications only refer to the leading edge, whether Medline was unreasonable in requiring that the specification apply to all four sides poses yet another question of fact for the jury.

Second, although the Product Specifications acknowledge that the 2 to 4 pound peel strength requirement represents "estimated approximate values" and that the "[a]ctual values [would] not be known until actual product [is] made" (*id.*), Medline requested that Cymbion produce packaging pouches having a peel strength of 2 to 4 pounds.  Cymbion spent several

18

months trying to accommodate this request. Cymbion also has presented evidence that Medline

has accepted a broader range for the film-to-film seals for its own west scrub brushes:

specifically, 1.8 to 6.3 pounds per inch. (Cymbion's Ex. 40, MED0017983-88 at

MED0017987.)[9] Based on this evidence, a jury could reasonably infer that Medline acted

unreasonably by requesting that the packaging pouches have a 2 to 4 pound peel strength on all

four edges.

Finally, in addition to its requests regarding the packaging peel strength, Medline also

determined that the first round of stability testing produced unsatisfactory results. In January

2007, it requested that Cymbion submit the samples for a second round of stability testing, which

Medline anticipated would take approximately three months. (*See* Cymbion Ex. 29,

MED0000217 (noting that second stability testing would be a "three month process.").) Before

that testing was completed, Medline terminated the Agreement. Again, whether Medline's

actions regarding the stability testing were unreasonable or at odds with the reasonable

expectations of the parties is a question of fact for a jury. Consequently, the court finds that

Cymbion has raised a genuine issue of material fact with respect to its counterclaim for breach of

---

[9] Medline argues that Cymbion has not presented any admissible evidence of the 1.8 to 6.3 pound per inch range because the document on which that range appears, Cymbion's Exhibit 40, is not attached to an affidavit and consequently lacks authenticity and foundation. To the contrary, because Medline produced this document during discovery, the court finds that the "very act of production [is] implicit authentication." *Vulcan Golf L.L.C. v. Google Inc.*, 2010 WL 2363620, at *2 (N.D. Ill. June 9, 2010) (quoting *United States v. Brown*, 688 F.2d 1112, 1116 (7th Cir. 1982) and overruling party's authenticity and foundation objection to documents produced during discovery by that party); *see also Thanongsinh v. Bd. of Educ.*, 462 F.3d 762 , 779 (7th Cir. 2006) ("Requiring authenticating affidavits . . . would be an empty formality" where the defendant drafted the relevant documents and produced them during discovery), *cited by Vulcan Golf*, No. 07 C 3371, 2010 WL 2363620, at *2. Consequently, the court finds that this documents is evidence which could be admissible at trial and the court accordingly has considered it in ruling on Medline's Motion.

contract based on a breach of the implied duty of good faith and fair dealing.

2. Failure to Purchase Scrub Brushes

According to Cymbion, Medline also breached the Second Supply Agreement by terminating the Agreement without purchasing any *dry* scrub brushes, which Cymbion was "ready and able to manufacture."[10]   Specifically, Cymbion argues that "[u]nder the [Second] Supply Agreement Medline was required to purchase a 'minimum purchase volume' of the *dry* scrub brushes" (Cymbion's Resp. 20), an interpretation of the Agreement which Medline has not challenged in its Reply (*see* Medline's Reply 6-8 (emphasis added)).  Medline additionally does not dispute that it terminated the Supply Agreement before purchasing any *dry* scrub brushes from Cymbion.  Instead, Medline contends that Cymbion has not presented evidence that it was "ready or able to produce" the *dry* scrub brushes.

As the district court recognized in *Alra*, "[a] breach of contract action requires that the complaining party was ready and able to perform its part of the bargain."  *Alra*,1999 WL 160710, at *6.  Specifically,

> [T]o recover damages, the injured party must show that, had there been no repudiation, that party could have performed or tendered performance as required under the contract: the builder must show that the building could have been finished; the vendor must show that the deed could have been tendered.

*Id.* (quoting E. Allan Farnsworth, *Farnsworth on Contracts*, § 8.22 at 677 (2d ed. 1990)).  The parties agree that Cymbion must have been ready and able to manufacture the *dry* scrub brushes to prevail on its counterclaim for breach of contract.  (*See* Dkt. No. 69, Cymbion's Resp. 7;

---

[10]  Medline appears to misconstrue Cymbion's breach of contract argument as an "affirmative defense" to Medline's declaratory judgment claim as opposed to a basis for Cymbion's breach of contract counterclaim.  (*See* Medline's Reply 6 ("[Cymbion] cites no authority indicating that [its ability to manufacture *dry* scrub brushes] is an affirmative defense to Medline's declaratory judgment action.").)

Medline's Reply 6.)

In this case, the court finds that the evidence, when viewed in the light most favorable to Cymbion, supports the reasonable inference that Cymbion was ready and able to manufacture *dry* scrub brushes. Medline does not dispute that the *dry* scrub brushes only have to comply with the FDA *device* regulations. (*See* Medline's Mem. 7.) In his affidavit, Dipak attests that based on his personal knowledge "Cymbion manufactured brushes that complied with all the requirements under the FDA regulations pertaining to medical devices." (Dipak Aff. ¶ 35.)[11]

The court also disagrees with Medline that Cymbion cannot prove that it was ready and able to perform because Cymbion's packaging materials were beyond their shelf life. To the contrary, Cymbion has presented evidence that it took action to order new film material from Alcan but had not yet received it when Medline terminated the Second Supply Agreement. (*See* Dipak Aff. ¶ 35.) Viewing this evidence in the light most favorable to Cymbion, the court finds that it supports the reasonable inference, when the evidence is viewed in Cymbion's favor, that Cymbion would have been ready and able to supply Medline with the *dry* scrub brushes called for in the Second Supply Agreement.

Finally, the court is similarly unpersuaded by Medline's argument that Cymbion's failure to "fill[] Medline's purchase order requesting delivery of both *wet* and *dry* scrub brushes" demonstrates that Cymbion was not ready or able to produce *dry* scrub brushes. (*See* Medline's

---

[11] Medline has moved to strike this statement from Dipak's affidavit, arguing that it is "a legal conclusion regarding Cymbion's alleged compliance with FDA regulations." (Medline's Mot. Strike 37.) Based on the evidence of Dipak's personal knowledge currently before the court, including Dipak's deposition testimony, his affidavit, and the various documents cited to the court, the court finds Dipak's opinion regarding Cymbion's compliance with certain FDA regulations is the type of lay opinion which would be admissible at trial. *See* Fed. R. Evid. 701. Consequently, the court has considered this evidence in ruling on Medline's Motion, and Medline's objection is overruled.

Reply 8 (emphasis added).)  Instead, viewing the evidence in the light most favorable to

Cymbion, the court finds that a jury could reasonably infer that Cymbion's failure to supply

Medline with the *dry* scrub brushes was not based on Cymbion's inability to manufacture the

brushes but instead on its on-going efforts to comply with Medline's requirements.

Consequently, the court finds that Cymbion has presented sufficient evidence from which a jury

could reasonably find in favor of Cymbion on its breach of contract counterclaim based on

 Medline's failure to purchase any *dry* scrub brushes from Cymbion.

The court has specifically considered Medline's other arguments in support of its Motion

and finds them also unpersuasive.  Consequently, Medline's Motion for Summary Judgment on

its claim for a declaratory judgment that it terminated the Second Supply Agreement with cause

(Count II) and on Cymbion's counterclaim that Medline breached the Agreement is denied.

<u>CONCLUSION</u>

For the reasons explained above, Medline's "Motion for Summary Judgment on Count II

of Its Complaint and Defendant's Counterclaim" (Dkt No. 61) is denied.  Unless otherwise

addressed in this opinion, both Medline's and Cymbion's Motions to Strike (Dkt. Nos. 85, 88)

are denied as moot.  This case remains set for trial on December 6, 2010.  All previously set

dates remain in effect.  The parties are strongly encouraged to discuss settlement.

ENTER:

_James F. Holderman_____

JAMES F. HOLDERMAN
Chief Judge, United States District Court

Date: November 16, 2010